FILED 10 AUG '23 13:08 USDC-ORP

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

_Portland_ DIVISION

_Daniel Applegate_

_(Enter full name of plaintiff)_

Plaintiff,

v.

MCSO Farth Mackie

Multnomah County Detention Center

MCSO Deputy Travis Atchie

MCSO Deputy Kerri Oman

MCSO Sgt. David Hughes

_(Enter full name of ALL defendant(s))_

MCSO Captain Asboe

Nathan Still

GPD     Defendant(s).

Civil Case No. 3:23-Cv - 1168 SI
(to be assigned by Clerk's Office)

**COMPLAINT FOR VIOLATION OF CIVIL RIGHTS (PRISONER COMPLAINT)**

Jury Trial Demanded

☒Yes      ☐No

## I. PARTIES

_List your name, address, and telephone number below, and the same information for each defendant. Make sure that the defendant(s) listed below are identical to those contained in the caption of the complaint. Attach additional sheets of paper if necessary._

**Plaintiff**

Name: _Daniel Applegate_

Street Address: _11540 NE Inverness Road_

City, State & Zip Code: _Portland, Oregon 97220_

Telephone No.: _____

Complaint for Violation of Civil Rights (Prisoner Complaint)
[Rev. 01/2018]

**Defendant No. 1**    Name: _Travis Richie_
Street Address: _234 SW Kendall Avenue_
City, State & Zip Code: _Troutdale, OREGON 97060_
Telephone No.: _____

**Defendant No. 2**    Name: _Kerri Oman_
Street Address: _234 SW Kendall Avenue_
City, State & Zip Code: _Troutdale, Oregon 97060_
Telephone No.: _____

**Defendant No. 3**    Name: _David Hughes_
Street Address: _234 SW Kendall Avenue_
City, State & Zip Code: _Troutdale, Oregon 97060_
Telephone No.: _____

**Defendant No. 4**    Name: _Multnomah County Detention Center_
Street Address: _11540 NE Inverness Drive_
City, State & Zip Code: _Portland, Oregon 97220_
Telephone No.: _____

## II. BASIS FOR JURISDICTION

Under 42 U.S.C. § 1983, you may sue state or local officials for the "deprivation of any rights, privileges, or immunities secured by the Constitution and [federal laws]." Under *Bivens v. Six Unknown Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), you may sue federal officials for the violation of certain constitutional rights.

A. You are bringing suit against (*check all that apply*):

☐ Federal officials (a *Bivens* claim)

☒ State or local officials (a § 1983 claim)

Complaint for Violation of Civil Rights (Prisoner Complaint)
[Rev. 01/2018]

2

**B. What federal constitutional, statutory, or treaty right(s) is/are at issue?**

U.S. Constitution 8th Amendment "Cruel & Unusual Punishment"
Deliberate Indifference
Physical and Emotional Injury
Assault 4
Criminal Mistreatment
Excessive Use of Force

## III. STATEMENT OF CLAIMS

### Claim I

*State here as briefly as possible the facts of your case. Describe how each defendant was involved, when the conduct occurred, and any injuries you have suffered as a result. It is not necessary to give any legal arguments or cite any cases or statutes.*

On April 27th 2023 officer Oman
Intentionally and unprovoked Maced
Me in the face was and Mouth, a full can.
I was standing on the rooftop at my
Mothers house. Upon being Maced twice (2nd by Richie)
I could no longer see and this creates
a threat to my health and safety
because I could slip and fall on the roof
or fall off it causing me dangerous injury
or possible death. The Mace irritated My skin
and burned My face, eyes and got into My mouth
which is not healthy given toxic ingredients chemicals

### Claim II

*State here as briefly as possible the facts of your case. Describe how each defendant was involved, when the conduct occurred, and any injuries you have suffered as a result. It is not necessary to give any legal arguments or cite any cases or statutes.*

The Multnomah County Shriffs Office, Gresham Police Department
and the Federal Bureau of Investigation demonstrated deliberate
indifference by allowing the officer who Maced Me to Mace
Me unprovoked not once but twice and not instructing him

Complaint for Violation of Civil Rights (Prisoner Complaint)
[Rev. 01/2018]

that Macing me is physically and logically
unneccessary being that I was not a direct
or indirect threat/imminent threat I was
just standing there on the roof Officer Oman + Richie,
authorized by  Macing me is not in accordance with Law
MCSO Sgt. Hughes  regarding such matters, as just stated and
his fellow officers also demonstrated a complete
disregard for the law and protocol and my health,
safety and wellbeing-given the mace in my face,
eyes and mouth and the fact that I could slip and fall
off the roof. There were at least 10-15 other officers
who witnessed this and stood by and allowed it to happen without

**Claim III**

State here as briefly as possible the _facts_ of your case. Describe how each defendant was verbal and physical reprimand
involved, when the conduct occurred, and any injuries you have suffered as a result. It is not physical reprimand
necessary to give any legal arguments or cite any cases or statutes.  MCSO, Oman + Richie refused
to get me medical treatment.
Did not even
contact, attempt
to!

MCSO, Oman+Richie
prevented me from seeking
medical treatment via my phone
because the phone is bugged
(has software on it) to where
they can prevent me from making
a call or using my phone at all.
They manipulated it when I tried to
call for medical treatment for the mace
in my face and throat and eyes.

_(If you have additional claims, describe them on another piece of paper, using the same outline.)_

Complaint for Violation of Civil Rights (Prisoner Complaint)
[Rev. 01/2018]                                                   4

## IV.  EXHAUSTION OF ADMINISTRATIVE REMEDIES

I have filed for administrative relief as to all claims in Section III and have concluded all
administrative appeals available to me.

☒Yes          ☐No

## V.  RELIEF

State *briefly* exactly what you want the court to do for you and the amount, if any, of
monetary compensation you are seeking.  Make no legal arguments.  Cite no cases or statutes.

I want all officers reprimanded
for their deliberate indifference,
negligence, and malicious and
intentional acts of violence.
Because this is an ongoing problem
and law enforcement consistently
harasses me, and assaults me (I have
been maced before and have broken bones
by the same agencys, namely MCSO) I
respectfully ask the court for $15,000

I declare under penalty of perjury that the foregoing is true and correct.

Signed this ___3rd___ day of __August__, 20_23_.

*Daniel Applegate*
*(Signature of Plaintiff)*

Complaint for Violation of Civil Rights (Prisoner Complaint)
[Rev. 01/2018]

5

Claim 4

On April 27th 2023 I was booked and lodged on 4-Bravo at MCDC. I was not given the opportunity to shower for 3 days, to decontaminate until the 30th of April 2023. I was maced not once but twice, with 2 cans of mace and in accordance with law DECONTAMINATION is required immediately. Given all that my body was infected with toxic chemicals, sinking into my pores, my nose, throat, and mouth, and eyes and vision could effect my health, and MCDC staff knowing this, this is deliberate indifference and criminal mistreatment on MCDC staff, who are a part of the Multnomah County Sheriffs Office, in their full capacity, especially MCSO MCDC staff working in 4-Bravo at MCDC.

from above



**Multnomah County**
**Health Department**

Date/Time Received in Medical:

MRN: _____

# Medical Request Form (MRF)

### If you have an emergency, tell a deputy or health staff right away!

Name: _____    Today's Date: _____

SWIS ID#: _____    Current Time: _____

Date of Birth: _____    Housing Unit: _____

**Are you allergic to any food or medicines? If yes, please explain:** _____

_____

**What is your non-emergency health concern?** _____

_____

_____

_____

_____

**How long have you had this problem?** _____

_____

You will not be charged for any care or treatment provided by Corrections Health, this includes not being charged for: Medical care, mental health care, and dental care, and also outside appointments scheduled by Corrections Health.

We offer free vaccinations (Seasonal Flu, Covid-19, Hepatitis A&B, Tetanus and more)
We also offer free STD screening and treatment.

If you are interested, please submit a MRF and you will be contacted by a Corrections Health Staff Member.

I give my permission to get medical, dental, or mental health exams and treatment from medical staff.

Signature: _____

COR-202 - 8/12/21

WEAPONS-OTHER

# Multnomah County Sheriff's Office
## DISTRICT ATTORNEY RELEASE

CASE NUMBER
GO **40 2023-18576**

| NARRATIVE | |
|---|---|
| **AUTHOR** MACKIE, FAITH M (63295) | **DATE/TIME** 04/27/2023 1459 |
| **SUBJECT** DANIEL ARRESTED MULTIPLE CHARGES | |

Summary:

Daniel Applegate was arrested for unlawful use of weapon, restraining order violation and a felony warrant.

Narrative:

On 04/27/2023 at approximately 0619 hours I was dispatched to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ o the residence of Annette Applegate who reported her son Daniel Applegate was on the property and that she has a restraining order against him. the call notes read, **"COMPS SON THAT COMP HAS RO AGAINST IN THE BACKYARD NOW... HE IS DANIEL APPLEGATE..07061989"**. A valid RO was found in LEDS preventing Daniel from contacting Annette or being at her home. Daniel also had a felony warrant out of Marion County.

Upon arrival myself and other deputies surrounded the house and could hear Daniel yelling from the backyard. Once Daniel saw us he became agitated and was attempting to flee the property. Multiple Deputies told him that he was under arrest for a violation of a restraining order. Daniel then climbed onto the roof where he would stay for approximately the next 7 hours.

Once Daniel was on the roof we had Annette lock all the windows in the house and exit her house. We had Annette lock all the windows because we were fearful that Daniel could gain access to the inside of the house through a window and barricade himself within. Annette was escorted by Deputies to a nearby safe location.

Myself and other deputies began giving verbal commands and instructions to Daniel in attempts to get him off the roof. Fire Dept was contacted and supplied us with a ladder. Myself and other deputies leaned the ladder on the rooftop which caused Daniel to become more agitated. Daniel attempted to pull the ladder up onto the rooftop, myself and Deputy Monda pulled the ladder back down. Myself and other Deputies were fearful that if Daniel had access to the ladder on the rooftop he could use it as a weapon against us or as a tool to break a widow and gain entry into the house.Daniel pulled a pocket knife from his pocket, opened it and began swing it around in the air while yelling "if you come up on this roof I will kill you".

Paramedics were called and staged at a safe location. Gresham PD Drone team arrived near this time and was able to record moments of the incident.

WEAPONS-OTHER

# Multnomah County Sheriff's Office
## DISTRICT ATTORNEY RELEASE

CASE NUMBER
GO 40 2023-18576

After multiple hours, Daniel was still refusing to come down off the roof and the drone was activated in a LRAD manner. This was used in attempts to annoy Daniel to get him down from the rooftop. Daniel appeared to be annoyed by the drone and called 911 from the rooftop. Dispatch advised of this and we were able to transfer the phone call to Deputy Oman. Deputy Oman is a CNT trained Deputy and began attempting de-escalation via phone. So the drone stopped utilizing the LRAD.

The ladder was placed back leaning against the rooftop and was tied down to the house, to give Daniel a safe route to get off the roof.

After hours of de-escalation attempts, Daniel began moving around the rooftop trying to find a more comfortable shaded area. In attempts to limit his movement and keep him isolated on one side of the roof, multiple Deputies administered OC spray onto the rooftop. Daniel happen to move around quickly while verbally threatening us and turned into the OC spray Deputy Ritchie had been spraying on the siding to Daniel's right.

Approximately an hour after being sprayed, a Gresham officer negotiated a trade. The officer told Daniel if he dropped the knife off the rooftop that we would give him some water for his discomfort. Daniel complied with this directive and dropped the knife, and a partial water bottle was given to Daniel.

At approximately 1200 hours Daniel moved onto the east end of the rooftop above the backyard. Deputies were staged inside the house with a visual of Daniel through an upstairs window. The ladder was moved to the backyard to give Daniel access to comply with our directives to come down from the roof. After more time passed Daniel became more lethargic, the OC seemed to have been effecting his ability to keep his eyes open. He also began discharging mucus from his nose and mouth frequently.

Deputies inside the house opened a second floor window and stated a dialog with Daniel who was still refusing to come down from the roof or into the home through the open window. Deputies at the window had a fleeting opportunity to grab Daniel and pull him inside the house and they took it. Daniel appeared to pull away when first grabbed but then surrendered and was secured into cuffs.

I placed Daniel in the rear of my patrol vehicle and provided him with water. I called and confirmed Daniel's warrant.  Deputy Monda asked Daniel if he was injured or in need of medical attention and Daniel said he was not injured and refused medical. AMR was still

WEAPONS-OTHER

## Multnomah County Sheriff's Office
### DISTRICT ATTORNEY RELEASE

CASE NUMBER
GO 40 2023-18576

After multiple hours, Daniel was still refusing to come down off the roof and the drone was activated in a LRAD manner. This was used in attempts to annoy Daniel to get him down from the rooftop. Daniel appeared to be annoyed by the drone and called 911 from the rooftop. Dispatch advised of this and we were able to transfer the phone call to Deputy Oman. Deputy Oman is a CNT trained Deputy and began attempting de-escalation via phone. So the drone stopped utilizing the LRAD.

The ladder was placed back leaning against the rooftop and was tied down to the house, to give Daniel a safe route to get off the roof.

After hours of de-escalation attempts, Daniel began moving around the rooftop trying to find a more comfortable shaded area. In attempts to limit his movement and keep him isolated on one side of the roof, multiple Deputies administered OC spray onto the rooftop. Daniel happen to move around quickly while verbally threatening us and turned into the OC spray Deputy Ritchie had been spraying on the siding to Daniel's right.

Approximately an hour after being sprayed, a Gresham officer negotiated a trade. The officer told Daniel if he dropped the knife off the rooftop that we would give him some water for his discomfort. Daniel complied with this directive and dropped the knife, and a partial water bottle was given to Daniel.

At approximately 1200 hours Daniel moved onto the east end of the rooftop above the backyard. Deputies were staged inside the house with a visual of Daniel through an upstairs window. The ladder was moved to the backyard to give Daniel access to comply with our directives to come down from the roof. After more time passed Daniel became  more lethargic, the OC seemed to have been effecting his ability to keep his eyes open. He also began discharging mucus from his nose and mouth frequently.

Deputies inside the house opened a second floor window and stated a dialog with Daniel who was still refusing to come down from the roof or into the home through the open window. Deputies at the window had a fleeting opportunity to grab Daniel and pull him inside the house and they took it. Daniel appeared to pull away when first grabbed but then surrendered and was secured into cuffs.

I placed Daniel in the rear of my patrol vehicle and provided him with water. I called and confirmed Daniel's warrant.  Deputy Monda asked Daniel if he was injured or in need of medical attention and Daniel said he was not injured and refused medical. AMR was still

# Multnomah County Sheriff's Office
## DISTRICT ATTORNEY RELEASE

On 04/27/2023 I was wearing a uniform, displaying a badge, and operating a marked patrol vehicle in Multnomah County, Oregon. At approximately 0619 I heard a call of a restraining order violation involving Daniel Applegate a ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ The call read:

**COMPS SON THAT COMP HAS RO AGAINST IN THE BACKYARD NOW... HE IS DANIEL APPLEGATE..07061989/**

I recognized the location and Applegate's name from MCSO's numerous encounters with him. I knew from previous encounters that Applegate is hostile to Law Enforcement and has been the subject of numerous uses of force. I also know he has caused substantial injuries to deputies in the past and has assaulted family members at the listed address.

Further updates from dispatch said Applegate could be heard pounding on the door to there house and his mother believed he was high on methamphetamines. I heard MCSO Deputy Delatorre give an update that he confirmed there was a valid restraining order against Applegate at the target address.

As I approached the scene, I heard deputies give an update saying Applegate had fled from the arrest team and had climbed onto the roof of the target address. I went to the backyard of the residence and saw Applegate on the roof pacing around. The roof was two stories with separate levels. I, along with other deputies, attempted to speak with Applegate, but initially received no response from him. I could see his lips moving as if he were muttering and his eyes wandered aimlessly. His fingers and hands were flexed in awkward positions and he fidgeted sporadically. I could see Applegate periodically smoke from a vape pen and an elongated glass tube, commonly used to smoke methamphetamine. I heard an update that Applegate's mother had removed herself from the scene and was safe.

MCSO Deputy Oman arrived and spoke with Applegate. He responded to her with swearing and threats to assault us, shoot us, and to murder our families. Applegate paced to both sides of the house to swear at deputies on either side, as both sides had been covered by deputies.

An initial plan was put in place to have an arrest team use a ladder to go onto the roof to arrest Applegate. Once the ladder was in place, I saw Applegate pull on the ladder and try to take it onto the roof, but MCSO Deputy Mackie kept him from doing so. At the same time the struggle over the ladder ensued, I heard yelling and then an update saying Applegate had pulled out a large knife and was threatening deputies with it. I then saw Applegate come to the back side of the roof and began to threaten the deputies in the backyard with me.

Over the next several hours I held lethal cover with my patrol rifle in the backyard while several negotiation/deescalation strategies were employed. I saw multiple deputies and

## Multnomah County Sheriff's Office
### DISTRICT ATTORNEY RELEASE

Gresham Officers attempt to deescalate or negotiate, we tried backing off and giving Applegate space to come down, we offered water and glasses (as Applegate was reported to have very poor vision), and used drones to give commands and make uncomfortable noises. All attempts to gain compliance were unsuccessful.

At one point I heard reports of OC being deployed on the opposite side of the house. I could see Applegate was coughing and spitting and could hear him complaining of discomfort. Deputies and Officers continued to offer water and exposure care, but Applegate refused to come off the roof.

Eventually Applegate agreed to drop the knife in exchange for some water. Deputy Mackie retrieved the knife, but Applegate still refused to come down. I saw Applegate climb onto an awning on the backside of the house and I thought he was trying to make entry into a window as he began to pound on it. I ran into the house with several other deputies and went upstairs to either deny access or effect an arrest in order to prevent Applegate from barricading inside the house.

Applegate argued with us through the window and demanded to see a warrant for his arrest. Applegate was shown a printed copy of his arrest warrant, but he would still not comply. As the standoff had been going on for more than 6 hours, the temperature was rising, Applegate was becoming more dehydrated, and Applegate had been exposed to OC, we began to fear of an increased risk of him falling off the roof and becoming seriously injured. MCSO Sgt. Hughes told the deputies in the house to take hold of Applegate and pull him into the house through a window if the opportunity presented itself and we felt we could do so without injuring ourselves or Applegate.

In speaking with Applegate through the window, he eventually came close enough and reached inside that deputies were able to get a hold of his arms. I assisted by keeping MCSO Deputy T. Ritchie from being pulled through the window by pulling on the back of his vest. I saw Applegate became partially wedged halfway in the window and I reached over the deputies to grab hold of Applegate's waistline and pulled his bottom half through the window. We pulled Applegate through the window and directly onto the floor. I took hold of his right arm and assisted in rolling him to his stomach so he could be placed in handcuffs. All force ceased once Applegate was secured in handcuffs.

Once the handcuffs were on, MCSO Deputy Shipley performed a quick pat search and we stood him to his feet. Deputy Ritchie and I escorted Applegate outside where he was searched again and aid was rendered. He was placed in MCSO Deputy Monda's patrol vehicle and I saw AMR respond to care for him.

I cleared after a debrief was held.

WEAPONS-OTHER

# Multnomah County Sheriff's Office
## DISTRICT ATTORNEY RELEASE

**CASE NUMBER**
**GO 40 2023-18576**

| **FOLLOWUP REPORT #2** | | | | | |
|---|---|---|---|---|---|
| **ASSIGNED TO**<br>OMAN, KERRI P (45622) | **RANK** | | | | |
| **ORG UNIT**<br>PATROL | **CAPACITY**<br>1-PATROL SUPPLEMENTAL | | | | |
| **ASSIGNED ON**<br>04/27/2023 | **ASSIGNED BY**<br>OMAN, KERRI P | **SUBMITTED ON**<br>04/27/2023 | **APPROVED ON**<br>04/27/2023 | **APPROVED BY**<br>WEBER, TODD A | |
| **SUPPLEMENTAL** | | | | | |
| **AUTHOR**<br>OMAN, KERRI P (45622) | | | **DATE/TIME**<br>04/27/2023 1408 | | |
| **SUBJECT**<br>SUPPLEMENTAL | | | | | |

DA # 2460086

WEAPONS-OTHER

# Multnomah County Sheriff's Office
## DISTRICT ATTORNEY RELEASE

CASE NUMBER
GO 40 2023-18576

OFFICERS MENTIONED:

Deputy Ritchie, DPSST# 54996, MCSO

Sgt Hughes, DPSST# 52811, MCSO

NARRATIVE:

On 04/27/23 at 0619 hours, deputies were dispatched to ███████████████ on a report of a restraining order violation. At 0633 hours I heard an update that the suspect, identified as Daniel Applegate, had crawled up onto the roof. I arrived on scene at 0637 hours and went into the backyard to make contact with Sgt Hughes. Sgt Hughes assigned me as the CNT entity to try to talk to Applegate.

Applegate was hostile and calling me names and making threats to kill me and my family. At approximately 0915 hours, Applegate called 911 from the roof. I stepped away from his view and dispatch transferred the call to me. I spoke with Applegate for a while and he told me that he wanted to press charges on his mom. He also said he wasn't going to come down from the roof. I talked with Applegate for approximately 30 minutes, trying to build rapport and convince him to come down before he hung up on me. Applegate called 911 again and they again patched him through to my phone. I spoke with him for another 10 minutes before he hung up on me. He was adamant about not coming down from the roof.

At approximately 1130 hours, a plan was made to deploy OC spray on the roof and house area above the garage. The idea was to deny him access to the area by making it uncomfortable for him to be in that area. I sprayed the area with a large can and Applegate became very hostile again, throwing a vape pipe down at me and trying to spit on me. After some time another OC deployment was made by Deputy Ritchie. I had stepped back away from the garage due to Applegate trying to spit on me and I saw Deputy Ritchie walk up to the side of the house and deploy his OC directed at the wall of house behind where Applegate was sitting. As Deputy Ritchie was deploying his spray, I saw Applegate turn his body to look down at Deputy Ritchie and Applegate was inadvertently sprayed in the face when he turned his head into the stream (see related reports).

After some time, I tried contacting Applegate by phone again. He wouldn't answer the phone but he eventually made contact with me via text message. We exchanged a couple texts but then he stopped responding and I sent approximately 10 unanswered text messages. At 1248 hours, Applegate was taken into custody.

Nothing further at this time.

Attach to related reports.

WEAPONS-OTHER

## Multnomah County Sheriff's Office
### DISTRICT ATTORNEY RELEASE

CASE NUMBER
GO 40 2023-18576

OFFICERS MENTIONED:

Deputy Ritchie, DPSST# 54996, MCSO

Sgt Hughes, DPSST# 52811, MCSO


NARRATIVE:

On 04/27/23 at 0619 hours, deputies were dispatched to ███████████████ on a report of a restraining order violation. At 0633 hours I heard an update that the suspect, identified as Daniel Applegate, had crawled up onto the roof. I arrived on scene at 0637 hours and went into the backyard to make contact with Sgt Hughes. Sgt Hughes assigned me as the CNT entity to try to talk to Applegate.

Applegate was hostile and calling me names and making threats to kill me and my family. At approximately 0915 hours, Applegate called 911 from the roof. I stepped away from his view and dispatch transferred the call to me. I spoke with Applegate for a while and he told me that he wanted to press charges on his mom. He also said he wasn't going to come down from the roof. I talked with Applegate for approximately 30 minutes, trying to build rapport and convince him to come down before he hung up on me. Applegate called 911 again and they again patched him through to my phone. I spoke with him for another 10 minutes before he hung up on me. He was adamant about not coming down from the roof.


At approximately 1130 hours, a plan was made to deploy OC spray on the roof and house area above the garage. The idea was to deny him access to the area by making it uncomfortable for him to be in that area. I sprayed the area with a large can and Applegate became very hostile again, throwing a vape pipe down at me and trying to spit on me. After some time another OC deployment was made by Deputy Ritchie. I had stepped back away from the garage due to Applegate trying to spit on me and I saw Deputy Ritchie walk up to the side of the house and deploy his OC directed at the wall of house behind where Applegate was sitting. As Deputy Ritchie was deploying his spray, I saw Applegate turn his body to look down at Deputy Ritchie and Applegate was inadvertently sprayed in the face when he turned his head into the stream (see related reports).


After some time, I tried contacting Applegate by phone again. He wouldn't answer the phone but he eventually made contact with me via text message. We exchanged a couple texts but then he stopped responding and I sent approximately 10 unanswered text messages. At 1248 hours, Applegate was taken into custody.


Nothing further at this time.

Attach to related reports.

WEAPONS-OTHER

# Multnomah County Sheriff's Office
## DISTRICT ATTORNEY RELEASE

CASE NUMBER
GO **40 2023-18576**

| **FOLLOWUP REPORT #3** | | | | | |
|---|---|---|---|---|---|
| **ASSIGNED TO** HUGHES, DAVID (52811) | | **RANK** | | | |
| **ORG UNIT** PATROL | | **CAPACITY** 1-PATROL SUPPLEMENTAL | | | |
| **ASSIGNED ON** 04/27/2023 | **ASSIGNED BY** HUGHES, DAVID | **SUBMITTED ON** 04/27/2023 | **APPROVED ON** 04/27/2023 | **APPROVED BY** WEBER, TODD A | |
| **NARRATIVE** | | | | | |
| **AUTHOR** HUGHES, DAVID (52811) | | | **DATE/TIME** 04/27/2023 0619 | | |
| **SUBJECT** ACTION TAKEN | | | | | |

# Multnomah County Sheriff's Office
## DISTRICT ATTORNEY RELEASE

containment and the ability to track him should he come down and flee through the surrounding neighborhoods. I solidified the ground level containment teams and ensured roles were clearly established. Applegate's mother voluntarily left the residence, taking a .40cal pistol and a number of kitchen knives with her, and gave us permission to enter and secure the residence to prevent Applegate from entering the structure and becoming a barricaded suspect. Negotiations continued over the entirety of our time with Applegate, taking the form of plain voice communication, phone calls, or text messages.

LEDS/NCIC was down and at some point in the early stages of this call Dispatch advised Applegate also had a valid felony warrant. Around this time, we procured a ladder from GPD Fire and set it up near the front door of the home, providing a surrender path should Applegate decide to comply with our direction to come down. When Applegate observed the ladder, he became even more agitated and attempted to pull the ladder up onto the lower roof. Deputies proceeded to secure the ladder and prevent this, but at this point Applegate produced from his pocket a folding knife, opened it, and threatened to use it against us, making a variety of homicidal threats towards any LE that would approach him.

This escalation in his behavior then changed our contingency planning, as a number of other approaches were suggested prior. We attempted deploying the speaker on one of the drones, playing exceptionally loud, annoying sounds at nearly ear level in the hopes of driving him down off the roof and into custody. We waited for the environmental effects of heat and dehydration to kick in, as the day was increasingly sunny and warm as time went on. Capt. Asboe arrived on scene and we proceeded to discuss options as to how to peacefully and safely resolve the situation, eventually landing on continued negotiation attempts, continued loud sounds played from the drone, and the possibility we would need to use OC spray as an area-denial tool should Applegate descend from the upper roof and seek shade on other sides of the house as the sun moved across the sky. I contacted East Metro SWAT team leaders for a consult, and it was agreed that at this point the event did not rise to the level of a SWAT activation, and that other approaches could still lead to a resolution of the situation.

Water was offered to him. Cigarettes were offered to him. Even contact lenses were offered to Applegate, as he was significantly near-sighted and was clearly having difficulty reading his phone, holding it up to nearly his nose when he attempted to use it. All of these tactics yielded no improvement in the situation, as for hours Applegate continued to defy our commands and refused to come down and surrender peacefully, instead flipping us off and attempting to spit down on us whenever we'd approach.

At some point, Applegate descended to the lower roof over the garage and appeared to be looking to either jump down into the driveway or take refuge in the shade provided there. We had agreed to deploy OC spray to the siding of the house should he seek refuge on this section, as it was in the shade and provided a respite from the heat.

WEAPONS-OTHER

## Multnomah County Sheriff's Office
### DISTRICT ATTORNEY RELEASE

CASE NUMBER
GO 40 2023-18576

I observed Deputy Oman deploy her large OC canister toward the west siding on the upper level, yet it did not have the reach and instead deployed OC onto the lower roof itself, yielding no change in Applegate's behavior likely due to the light breeze and open air diffusing its strength. Deputy Ritchie then approached from the north and I observed him deploy his smaller OC canister toward and on the second floor exterior siding, however Applegate decided at this point to look around to the north, and inadvertently turned his head and body directly into a partial stream of OC spray. The effect was relatively immediate, and from that point until the resolution of the incident Applegate was noticeably impacted by the splash of OC he received.

Deputies then took turns verbally directing him to the south side of the house where he was offered water to mitigate the effects of the OC spray. GPD Officer Still did an excellent job convincing Applegate to trade the knife for water, as Applegate eventually tossed the knife off the side of the house in exchange for a bottle of water we left on the lower gutter, which he immediately drank. Further contingencies were crafted, one of which being further area denial with OC spray on the opposite side of the house (as Applegate was now on the southeast corner of the roof), and the possibility that should a fleeting opportunity present itself, we'd attempt to pull Applegate through a window and take him into custody inside the house.

Applegate eventually ended up moving around to the lower level roof on the east side of the house and ripped off a screen covering a 2nd story window, which caused us concern he was attempting to get inside. Being as we already had Deputies inside the home for this very possibility, I brought in several more and we attempted further plain-voice communication/negotiations through the two upstairs windows on the east side.

Two things were now taking place. One was the effects of the OC spray were beginning to wear off, as Applegate now had both eyes open and was displaying less overt discomfort from his inadvertent OC exposure. The second and corresponding factor was Applegate was becoming commensurately more agitated and hostile as the effects diminished, thus causing us concern we might lose further fleeting opportunities to take him into custody while under the effect of OC spray. As a result, we devised a plan to lure him in through one of the open windows, out of the heat and the sun, and take him into custody inside. Deputies Ritchie, Shipley, Eide, Johnson, myself, and GPD Officer Still along with Deputy Volker were all now upstairs and had access to either bedroom should Applegate attempt entry. Roles were again assigned and the decision was made to pull Applegate through the open window the next time he put both arms past the threshold, placing a decisive and safe end to what amounted to an unusual open-air barricaded situation, the barricade being his elevated position and the exceptionally dangerous possibility of taking a resistive suspect into custody on an angled rooftop.

I was positioned behind Johnson, Shipley, Ritchie, and Eide, next to Officer Still, and made sure all were clear on the plan. At some point Applegate put his arm through the window and I observed Deputies Shipley and Johnson immediately secure both of Applegate's arms and

WEAPONS-OTHER

## Multnomah County Sheriff's Office
### DISTRICT ATTORNEY RELEASE

CASE NUMBER
GO 40 2023-18576

| NARRATIVE | |
|---|---|
| **AUTHOR** MACKIE, FAITH M (63295) | **DATE/TIME** 04/27/2023 1459 |
| **SUBJECT** DANIEL ARRESTED MULTIPLE CHARGES | |

Summary:

Daniel Applegate was arrested for unlawful use of weapon, restraining order violation and a felony warrant.

Narrative:

On 04/27/2023 at approximately 0619 hours I was dispatched to ▮▮▮▮▮▮▮▮▮▮ to the residence of Annette Applegate who reported her son Daniel Applegate was on the property and that she has a restraining order against him. the call notes read, "**COMPS SON THAT COMP HAS RO AGAINST IN THE BACKYARD NOW... HE IS DANIEL APPLEGATE..07061989**". A valid RO was found in LEDS preventing Daniel from contacting Annette or being at her home. Daniel also had a felony warrant out of Marion County.

Upon arrival myself and other deputies surrounded the house and could hear Daniel yelling from the backyard. Once Daniel saw us he became agitated and was attempting to flee the property. Multiple Deputies told him that he was under arrest for a violation of a restraining order. Daniel then climbed onto the roof where he would stay for approximately the next 7 hours.

Once Daniel was on the roof we had Annette lock all the windows in the house and exit her house. We had Annette lock all the windows because we were fearful that Daniel could gain access to the inside of the house through a window and barricade himself within. Annette was escorted by Deputies to a nearby safe location.

Myself and other deputies began giving verbal commands and instructions to Daniel in attempts to get him off the roof. Fire Dept was contacted and supplied us with a ladder. Myself and other deputies leaned the ladder on the rooftop which caused Daniel to become more agitated. Daniel attempted to pull the ladder up onto the rooftop, myself and Deputy Monda pulled the ladder back down. Myself and other Deputies were fearful that if Daniel had access to the ladder on the rooftop he could use it as a weapon against us or as a tool to break a widow and gain entry into the house.Daniel pulled a pocket knife from his pocket, opened it and began swing it around in the air while yelling "if you come up on this roof I will kill you".

Paramedics were called and staged at a safe location. Gresham PD Drone team arrived near this time and was able to record moments of the incident.

WEAPONS-OTHER

## Multnomah County Sheriff's Office
### DISTRICT ATTORNEY RELEASE

CASE NUMBER
GO 40 2023-18576

After multiple hours, Daniel was still refusing to come down off the roof and the drone was activated in a LRAD manner. This was used in attempts to annoy Daniel to get him down from the rooftop. Daniel appeared to be annoyed by the drone and called 911 from the rooftop. Dispatch advised of this and we were able to transfer the phone call to Deputy Oman. Deputy Oman is a CNT trained Deputy and began attempting de-escalation via phone. So the drone stopped utilizing the LRAD.

The ladder was placed back leaning against the rooftop and was tied down to the house, to give Daniel a safe route to get off the roof.

After hours of de-escalation attempts, Daniel began moving around the rooftop trying to find a more comfortable shaded area. In attempts to limit his movement and keep him isolated on one side of the roof, multiple Deputies administered OC spray onto the rooftop. Daniel happen to move around quickly while verbally threatening us and turned into the OC spray Deputy Ritchie had been spraying on the siding to Daniel's right.

Approximately an hour after being sprayed, a Gresham officer negotiated a trade. The officer told Daniel if he dropped the knife off the rooftop that we would give him some water for his discomfort. Daniel complied with this directive and dropped the knife, and a partial water bottle was given to Daniel.

At approximately 1200 hours Daniel moved onto the east end of the rooftop above the backyard. Deputies were staged inside the house with a visual of Daniel through an upstairs window. The ladder was moved to the backyard to give Daniel access to comply with our directives to come down from the roof. After more time passed Daniel became more lethargic, the OC seemed to have been effecting his ability to keep his eyes open. He also began discharging mucus from his nose and mouth frequently.

Deputies inside the house opened a second floor window and stated a dialog with Daniel who was still refusing to come down from the roof or into the home through the open window. Deputies at the window had a fleeting opportunity to grab Daniel and pull him inside the house and they took it. Daniel appeared to pull away when first grabbed but then surrendered and was secured into cuffs.

I placed Daniel in the rear of my patrol vehicle and provided him with water.I called and confirmed Daniel's warrant. Deputy Monda asked Daniel if he was injured or in need of medical attention and Daniel said he was not injured and refused medical. AMR was still

WEAPONS-OTHER

## Multnomah County Sheriff's Office
### DISTRICT ATTORNEY RELEASE

CASE NUMBER
GO 40 2023-18576

Gresham Officers attempt to deescalate or negotiate, we tried backing off and giving Applegate space to come down, we offered water and glasses (as Applegate was reported to have very poor vision), and used drones to give commands and make uncomfortable noises. All attempts to gain compliance were unsuccessful.

At one point I heard reports of OC being deployed on the opposite side of the house. I could see Applegate was coughing and spitting and could hear him complaining of discomfort. Deputies and Officers continued to offer water and exposure care, but Applegate refused to come off the roof.

Eventually Applegate agreed to drop the knife in exchange for some water. Deputy Mackie retrieved the knife, but Applegate still refused to come down. I saw Applegate climb onto an awning on the backside of the house and I thought he was trying to make entry into a window as he began to pound on it. I ran into the house with several other deputies and went upstairs to either deny access or effect an arrest in order to prevent Applegate from barricading inside the house.

Applegate argued with us through the window and demanded to see a warrant for his arrest. Applegate was shown a printed copy of his arrest warrant, but he would still not comply. As the standoff had been going on for more than 6 hours, the temperature was rising, Applegate was becoming more dehydrated, and Applegate had been exposed to OC, we began to fear of an increased risk of him falling off the roof and becoming seriously injured. MCSO Sgt. Hughes told the deputies in the house to take hold of Applegate and pull him into the house through a window if the opportunity presented itself and we felt we could do so without injuring ourselves or Applegate.

In speaking with Applegate through the window, he eventually came close enough and reached inside that deputies were able to get a hold of his arms. I assisted by keeping MCSO Deputy T. Ritchie from being pulled through the window by pulling on the back of his vest. I saw Applegate became partially wedged halfway in the window and I reached over the deputies to grab hold of Applegate's waistline and pulled his bottom half through the window. We pulled Applegate through the window and directly onto the floor. I took hold of his right arm and assisted in rolling him to his stomach so he could be placed in handcuffs. All force ceased once Applegate was secured in handcuffs.

Once the handcuffs were on, MCSO Deputy Shipley performed a quick pat search and we stood him to his feet. Deputy Ritchie and I escorted Applegate outside where he was searched again and aid was rendered. He was placed in MCSO Deputy Monda's patrol vehicle and I saw AMR respond to care for him.

I cleared after a debrief was held.

DA# 2460086
PRINTED ON: 05/11/2023   PRINTED BY: 93393
ORIGINAL
Page 8/36
VERSION: 1/FINAL
Page 78

: WEAPONS-OTHER

# Multnomah County Sheriff's Office
## DISTRICT ATTORNEY RELEASE

CASE NUMBER
GO 40 2023-18576

**OFFICERS MENTIONED:**

Deputy Ritchie, DPSST# 54996, MCSO

Sgt Hughes, DPSST# 52811, MCSO

**NARRATIVE:**

On 04/27/23 at 0619 hours, deputies were dispatched to ████████████████ on a report of a restraining order violation. At 0633 hours I heard an update that the suspect, identified as Daniel Applegate, had crawled up onto the roof. I arrived on scene at 0637 hours and went into the backyard to make contact with Sgt Hughes. Sgt Hughes assigned me as the CNT entity to try to talk to Applegate.

Applegate was hostile and calling me names and making threats to kill me and my family. At approximately 0915 hours, Applegate called 911 from the roof. I stepped away from his view and dispatch transferred the call to me. I spoke with Applegate for a while and he told me that he wanted to press charges on his mom. He also said he wasn't going to come down from the roof. I talked with Applegate for approximately 30 minutes, trying to build rapport and convince him to come down before he hung up on me. Applegate called 911 again and they again patched him through to my phone. I spoke with him for another 10 minutes before he hung up on me.  He was adamant about not coming down from the roof.

At approximately 1130 hours, a plan was made to deploy OC spray on the roof and house area above the garage. The idea was to deny him access to the area by making it uncomfortable for him to be in that area. I sprayed the area with a large can and Applegate became very hostile again, throwing a vape pipe down at me and trying to spit on me. After some time another OC deployment was made by Deputy Ritchie. I had stepped back away from the garage due to Applegate trying to spit on me and I saw Deputy Ritchie walk up to the side of the house and deploy his OC directed at the wall of house behind where Applegate was sitting. As Deputy Ritchie was deploying his spray, I saw Applegate turn his body to look down at Deputy Ritchie and Applegate was inadvertently sprayed in the face when he turned his head into the stream (see related reports).

After some time, I tried contacting Applegate by phone again. He wouldn't answer the phone but he eventually made contact with me via text message. We exchanged a couple texts but then he stopped responding and I sent approximately 10 unanswered text messages. At 1248 hours, Applegate was taken into custody.

Nothing further at this time.

Attach to related reports.





VERSION: 1/TR3.1

**Multnomah County Sheriff's Office**
DISTRICT ATTORNEY RELEASE

**Summary:**

Sgt. Hughes responded along with MCSO and GPD units to a ROVIO call in Troutdale. A hostile suspect, Daniel Applegate, was in violation of a restraining order, had a valid felony warrant, and after climbing on to the roof at the residence, produced a knife and made homicidal statements toward Deputies. The suspect was taken into custody after a lengthy standoff and many different negotiations and tactics.

**Mentioned:**

MCSO and GPD Deputies and Officers.

**Action Taken:**

At the listed date and time, I along with other MCSO and GPD members responded to the listed address for a restraining order violation call on a known suspect, Daniel Applegate. I know from past contacts that Applegate is almost always hostile to LE by being combative, resistive, and is often under the influence of narcotics. Prior to LE arrival on scene, Deputy Delatorre confirmed with MCSO Records there was in fact a valid restraining order against Applegate and that he was in violation of said order at present.

Upon arrival I heard MCSO members air they were going to make contact with Applegate in the back yard. Upon walking to the back yard I joined the contact team and observed Applegate attempting to climb over a crude chicken wire fence topped by a thin wooden crossbeam. While we were verbally challenging Applegate, advising him he was not free to go and providing him with force warnings should he not comply, Applegate pulled himself onto the roof and proceeded to climb to the apex. In typical form, Applegate disregarded our commands to come down from the roof and proceeded to be verbally hostile and generally uncooperative, all while hurling invective our way and attempting to smoke what was left inside a glass pipe he produced on his person.

A short time after climbing onto to the roof Applegate called into 911, and I then had Dispatch direct his call to Deputy Oman as she is a CNT member with excellent negotiation skills. See Deputy Oman's report for further.

GPD's drone unit attached to our call and deployed overhead, providing us with visual

WEAPONS-OTHER

# Multnomah County Sheriff's Office
## DISTRICT ATTORNEY RELEASE

CASE NUMBER
GO 40 2023-18576

containment and the ability to track him should he come down and flee through the surrounding neighborhoods. I solidified the ground level containment teams and ensured roles were clearly established. Applegate's mother voluntarily left the residence, taking a .40cal pistol and a number of kitchen knives with her, and gave us permission to enter and secure the residence to prevent Applegate from entering the structure and becoming a barricaded suspect. Negotiations continued over the entirety of our time with Applegate, taking the form of plain voice communication, phone calls, or text messages.

LEDS/NCIC was down and at some point in the early stages of this call Dispatch advised Applegate also had a valid felony warrant. Around this time, we procured a ladder from GPD Fire and set it up near the front door of the home, providing a surrender path should Applegate decide to comply with our direction to come down. When Applegate observed the ladder, he became even more agitated and attempted to pull the ladder up onto the lower roof. Deputies proceeded to secure the ladder and prevent this, but at this point Applegate produced from his pocket a folding knife, opened it, and threatened to use it against us, making a variety of homicidal threats towards any LE that would approach him.

This escalation in his behavior then changed our contingency planning, as a number of other approaches were suggested prior. We attempted deploying the speaker on one of the drones, playing exceptionally loud, annoying sounds at nearly ear level in the hopes of driving him down off the roof and into custody. We waited for the environmental effects of heat and dehydration to kick in, as the day was increasingly sunny and warm as time went on. Capt. Asboe arrived on scene and we proceeded to discuss options as to how to peacefully and safely resolve the situation, eventually landing on continued negotiation attempts, continued loud sounds played from the drone, and the possibility we would need to use OC spray as an area-denial tool should Applegate descend from the upper roof and seek shade on other sides of the house as the sun moved across the sky. I contacted East Metro SWAT team leaders for a consult, and it was agreed that at this point the event did not rise to the level of a SWAT activation, and that other approaches could still lead to a resolution of the situation.

Water was offered to him. Cigarettes were offered to him. Even contact lenses were offered to Applegate, as he was significantly near-sighted and was clearly having difficulty reading his phone, holding it up to nearly his nose when he attempted to use it. All of these tactics yielded no improvement in the situation, as for hours Applegate continued to defy our commands and refused to come down and surrender peacefully, instead flipping us off and attempting to spit down on us whenever we'd approach.

At some point, Applegate descended to the lower roof over the garage and appeared to be looking to either jump down into the driveway or take refuge in the shade provided there. We had agreed to deploy OC spray to the siding of the house should he seek refuge on this section, as it was in the shade and provided a respite from the heat.

# Multnomah County Sheriff's Office
## DISTRICT ATTORNEY RELEASE

I observed Deputy Oman deploy her large OC canister toward the west siding on the upper level, yet it did not have the reach and instead deployed OC onto the lower roof itself, yielding no change in Applegate's behavior likely due to the light breeze and open air diffusing its strength. Deputy Ritchie then approached from the north and I observed him deploy his smaller OC canister toward and on the second floor exterior siding, however Applegate decided at this point to look around to the north, and inadvertently turned his head and body directly into a partial stream of OC spray. The effect was relatively immediate, and from that point until the resolution of the incident Applegate was noticeably impacted by the splash of OC he received.

Deputies then took turns verbally directing him to the south side of the house where he was offered water to mitigate the effects of the OC spray. GPD Officer Still did an excellent job convincing Applegate to trade the knife for water, as Applegate eventually tossed the knife off the side of the house in exchange for a bottle of water we left on the lower gutter, which he immediately drank. Further contingencies were crafted, one of which being further area denial with OC spray on the opposite side of the house (as Applegate was now on the southeast corner of the roof), and the possibility that should a fleeting opportunity present itself, we'd attempt to pull Applegate through a window and take him into custody inside the house.

Applegate eventually ended up moving around to the lower level roof on the east side of the house and ripped off a screen covering a 2nd story window, which caused us concern he was attempting to get inside. Being as we already had Deputies inside the home for this very possibility, I brought in several more and we attempted further plain-voice communication/negotiations through the two upstairs windows on the east side.

Two things were now taking place. One was the effects of the OC spray were beginning to wear off, as Applegate now had both eyes open and was displaying less overt discomfort from his inadvertent OC exposure. The second and corresponding factor was Applegate was becoming commensurately more agitated and hostile as the effects diminished, thus causing us concern we might lose further fleeting opportunities to take him into custody while under the effect of OC spray. As a result, we devised a plan to lure him in through one of the open windows, out of the heat and the sun, and take him into custody inside. Deputies Ritchie, Shipley, Eide, Johnson, myself, and GPD Officer Still along with Deputy Volker were all now upstairs and had access to either bedroom should Applegate attempt entry. Roles were again assigned and the decision was made to pull Applegate through the open window the next time he put both arms past the threshold, placing a decisive and safe end to what amounted to an unusual open-air barricaded situation, the barricade being his elevated position and the exceptionally dangerous possibility of taking a resistive suspect into custody on an angled rooftop.

I was positioned behind Johnson, Shipley, Ritchie, and Eide, next to Officer Still, and made sure all were clear on the plan. At some point Applegate put his arm through the window and I observed Deputies Shipley and Johnson immediately secure both of Applegate's arms and

## Multnomah County Sheriff's Office
### DISTRICT ATTORNEY RELEASE

attempt to pull him in through the window. I'd discussed the possibility that should Applegate brace and we get into a tugging match, I'd get onto the roof and push him in from behind. Applegate braced his elbow against the window for a brief second on the initial pull, so I then turned to go out the other window and push him in from behind. As I turned, I heard a "thump" which I interpreted as someone falling on the ground, and turned back only to see they had managed to pull again and get him inside the room. As they now had Applegate under control and were successfully placing him in custody, and there was no uncontrolled part of his body, I maintained oversight and observed them place Applegate in handcuffs with no further issue.

AMR was then called to check Applegate, and once he was cleared, Deputies Monda and Mackie transported Applegate to MCDC where he was booked into their custody.

I then joined the LE members on the call for a debrief, and upon completion I cleared the call and took no further action.

**Statements:**

See Action Taken.

**Evidence:**

See Action Taken.

**Action Recommended:**

None further. Attach to GO.

WEAPONS-OTHER

# Multnomah County Sheriff's Office
## DISTRICT ATTORNEY RELEASE

CASE NUMBER
GO 40 2023-18576

saw him again and never observed any injuries on him.

## Multnomah County Sheriff's Office
### DISTRICT ATTORNEY RELEASE

On 04/27/23 at approximately 0630 hours, I responded to ███████████████████ r a restraining order violation that involved Daniel APPLEGATE (07/06/89). I had prior calls that involved APPLEGATE and knew that he was a drug user, unpredictable in his behavior and would fight with law enforcement if he was placed under arrest. I arrived on scene and immediately grabbed my 40mm launcher as a less lethal option. As I approached from the north of the residence, I could hear APPLEGATE on the back side (east side) of the residence making noise. A containment team was staged on the south side of the residence. I loudly announced that we were with the sheriff's office and asked APPLEGATE to show himself. He did not comply. I heard the team on the south side give APPLEGATE commands. The team I was with moved into the back yard and I saw APPLEGATE standing on the southern deck railing, attempting to climb over the southern fence. I told APPLEGATE to stop, that he was under arrest, and that if he did not comply force may be used against him. I told APPLEGATE that he may be shot.

The team I was a part of attempted to move closer to APPLEGATE and ensure that he could not get into the house through the rear glass sliding door. As we began moving up, APPLEGATE jumped from the railing and got onto the roof of the residence. Our team backed away from the structure to maintain visual of APPLEGATE. APPLEGATE's mother entered the residence and ensured all second floor windows were locked. I heard Deputy Oman attempt negotiations with APPLEGATE. He was not receptive to negotiations. As I heard APPLEGATE speak, I could tell based off my training and experience that he was likely high on methamphetamine. There were many points during entirety of the call that he was talking to himself out loud, looking at something when nothing was in front of him, and holding a meth pipe that he would attempt to smoke from. APPLEGATE was telling us to come up on the roof so he could take our gun and throw us off. APPLEGATE repeatedly made gestures with his fingers to represent a gun that he would point at us. APPLEGATE repeatedly stated that he could get a gun and shoot us.

A ladder was provided as a surrender path for APPLEGATE to come off of the roof safely. At around 0700 hours, I moved to the front yard of the residence to provide a less lethal option if APPLEGATE used the ladder that was placed near the front door. Shortly after moving to the front, APPLEGATE attempted to pull the ladder onto the roof. I saw Deputy Monda (58485) run over and grab the lower portion of the ladder with other deputies to keep APPLEGATE from taking it. APPLEGATE let go of the ladder, reached in the pocket of his sweatshirt and pulled out a folding knife. I transitioned to my service pistol and prepared to use lethal force if APPLEGATE attempted to use the knife on the deputies that were within 15 feet of him at the bottom of the ladder. APPLEGATE backed away while he kept the knife in his hand. We determined that it would be best to take the ladder down until we had a way to secure it.

I gave the 40mm launcher I had to Deputy Monda and I moved to lethal cover with my agency issued rifle. I explained to Deputies on the front side of the residence that we would be staying away from the house to ensure that APPLEGATE could not throw the knife at one of us and seriously hurt or kill us. I explained that if he attempted to throw the knife at a deputy and I felt it had a chance to seriously hurt or kill a deputy, I would use lethal force on

DA# 2460086
PRINTED ON: 05/11/2023   PRINTED BY: 03301

ORIGINAL
Page 22/36

VERSION: 171813.1
Page 92

WEAPONS-OTHER

## Multnomah County Sheriff's Office
### DISTRICT ATTORNEY RELEASE

CASE NUMBER
GO 40 2023-18576

APPLEGATE. I knew the chance of APPLEGATE hitting one of use was low, although I was not willing to risk him getting lucky with a throw. I made it clear to everyone that I was not willing to risk that.

Negotiations continued with Deputy Oman (45622) via phone. I discussed with SGT Hughes and CPT Asboe about plans for resolution. The decision was made to make him uncomfortable on the roof and wait until he wanted to surrender. It was going to be a warmer day then usual and that would be to our benefit with APPLEGATE being on a roof. As negotiations struggled, the drone was utilized to create annoying sounds in hopes that it would create additional discomfort. APPLEGATE made multiple threats stating, "Come up here so I can throw you off and see if pigs fly."

At around 0915, I took paracord from my patrol vehicle and secured the ladder to an entryway vertical beam. I tied the ladder to that beam so APPLEGATE could not pull the ladder onto the roof, and Deputies would not have to be close to the ladder to retain it.

As the situation continued, APPLEGATE was getting uncomfortable with the rising temperature. APPLEGATE would look over the front (west) roof line to the lower roof that had the only shade available. As he checked that area, I spoke with SGT Hughes about ensuring that he could not go to that area. We discussed using OC spray on the exterior wall of the residence on the second level that would be near APPLEGATE if he moved down there. The goal was to use the OC fumes in the air to make it uncomfortable for APPLEGATE to the point he would not want to stay in the shade. After briefing the units on scene, Deputy Oman got her large can of OC spray.

At around 1130 hours, APPLEGATE moved to the shaded area on the lower roof and Deputy Oman applied the OC to the exterior wall near APPLEGATE. He stood up and started to dig into his right pocket where I believed his knife was at. I brought my rifle up to my shoulder and pointed it at APPLEGATE because Deputy Oman was very close to the residence for the OC application. APPLEGATE pulled out something other then the knife and threw it down at us. APPLEGATE then tried to spit on Deputy Oman. He threatened to spit on her if she got close again. The first OC application did not have the desired effect.

A few minutes later, Deputy Ritchie (54996) approached from the back side along the north exterior wall. APPLEGATE was still on the lower shaded roof verbally threatening and cursing at us. I saw Deputy Ritchie spray the OC towards the area APPLEGATE was, I could see that the OC was getting on APPLEGATES shirt. It seemed like a very small amount got on APPLEGATE and appeared to be splatter from the OC hitting the exterior wall. APPLEGATE made complaints that it got in his eyes. APPLEGATE attempted to spit on Deputy Ritchie as he moved towards the back side again. APPLEGATE began repeatedly stating that he was going to sue and would be making $5,000 from that.

## Multnomah County Sheriff's Office
### DISTRICT ATTORNEY RELEASE

As APPLEGATE was distracted with the OC, I saw Deputy Ritchie apply more OC to the exterior wall near APPLEGATE. While Deputy Ritchie was spraying, APPLEGATE turned towards him and I believed that he was going to spit on him. APPLEGATE's action of turning towards Deputy Ritchie, led to OC being sprayed what appeared to be directly on a portion of his face. APPLEGATE reacted drastically as though there was a larger amount of OC in his eyes then before. The OC had a strong effect on APPLEGATE and greatly limited his mobility on the roof. APPLEGATE was very angry and demanded water. I saw there was multiple gallons of water on the front side of the residence that were offered if APPLEGATE would come off of the roof.

The OC application allowed for negotiations between APPLEGATE and GPD Officer Still (57124). Officer Still was able to negotiate with APPLEGATE for him to drop the knife off the roof in return for a small bottle of water. APPLEGATE dropped the knife off the roof and he was given the water that he quickly drank. At that point, APPLEGATE had moved to the lower southern roof line on the back side of the house.

Negotiations continued with APPLEGATE and I moved the ladder to the back side, since his attention was focused there. I wanted him to have a way down if he chose to surrender. APPLEGATE would not surrender and said repeatedly that he would not come down. APPLEGATE moved to an awning that was over the back deck. That placed APPLEGATE near two bedroom windows on the east side of the residence. I handed my rifle to Deputy DeLatorre (46651) and moved inside the residence to help the team SGT Hughes had inside.

That presented an opportunity to safely go hands on with APPLEGATE since he was no longer armed with a knife.

APPLEGATE was demanding to see the warrant for his arrest. SGT Hughes stated to the team inside, that we would use that as an opportunity to get APPLEGATE near an open bedroom window and pull him in. Negotiations continued with APPLEGATE at the window of one of the bedrooms. SGT Hughes explained that we needed to wait until APPLEGATE was leaning towards the interior of the bedroom and was not bracing with his hands outside the window. The goal was to minimize APPLEGATE's ability to fight our efforts to pull him inside the room and take him into custody.

I was positioned on the left side of the window and closest to the opening on that side. Deputy Shipley (56242) was across from me on the right side of the window. SGT Hughes was to my right. Deputy Ritchie was left of Deputy Shipley and Deputy Eide was near Deputy Ritchie. Negotiations continued with Officer Still and he came inside the bedroom to keep APPLEGATE's attention inside and near the window. Officer Still was able to get APPLEGATE to reach into the bedroom with his left hand to grab the printed warrant. Deputy Shipley grabbed that arm quickly and began to pull APPLEGATE inside. As I was reaching to grab APPLEGATE and pull him in, I saw his right elbow bracing outside the window. I immediately transitioned to his right elbow and pulled it up and off the window. Once I cleared

WEAPONS-OTHER

## Multnomah County Sheriff's Office
### DISTRICT ATTORNEY RELEASE

CASE NUMBER
GO 40 2023-18576

APPLEGATE's elbow off the window, we were able to pull him inside the bedroom. APPLEGATE was taken immediately to the ground. I moved to his legs and pinned them against the floor with my body weight. APPLEGATE was pinned on the ground on his back. I did not feel APPLEGATE tensing up or resisting us. There was a brief pause and commands were given for APPLEGATE to slowly roll over to his stomach. I did not hear him verbally agree to comply. The other deputies began turning APPLEGATE over while controlling his limbs. I was facing his feet and controlling his legs so I did not see what each deputy was doing. I continued to control APPLEGATE's legs until he was placed into handcuffs.

After APPLEGATE was taken into custody, I exited the residence and felt a burning sensation on the inside of my upper left arm. I had further injured an abrasion that I sustained from a use of force earlier in the shift. It was visibly bleeding. It appeared that the injury was sustained from something on my protective vest. I gathered all of my equipment and cleared the scene. I took no further action.

WEAPONS-OTHER

# Multnomah County Sheriff's Office
## DISTRICT ATTORNEY RELEASE

CASE NUMBER
GO 40 2023-18576

| FOLLOWUP REPORT #7 | | | | | |
|---|---|---|---|---|---|
| **ASSIGNED TO**<br>RITCHIE, TRAVIS C (54996) | | **RANK** | | | |
| **ORG UNIT**<br>PATROL | | **CAPACITY**<br>1-PATROL SUPPLEMENTAL | | | |
| **ASSIGNED ON**<br>04/27/2023 | **ASSIGNED BY**<br>RITCHIE, TRAVIS C | **SUBMITTED ON**<br>04/28/2023 | **APPROVED ON**<br>04/28/2023 | **APPROVED BY**<br>JACKSON, DAVID L | |

| NARRATIVE | |
|---|---|
| **AUTHOR**<br>RITCHIE, TRAVIS C (54996) | **DATE/TIME**<br>04/27/2023 1421 |
| **SUBJECT**<br>SUPPLEMENTAL | |

## Multnomah County Sheriff's Office
### DISTRICT ATTORNEY RELEASE

On 4/27/2023 at approximately 0623 hours I was dispatched to ████████████ for a report of a restraining order violation.

I arrived on scene and was with other Deputies when we challenged Daniel Applegate in the back yard of the residence. When we attempted to approach him, he climbed onto the roof and out of reach of us. Multiple resources were called and used to attempt to deescalate Applegate. At one point he retrieved a pocket knife from his pocket and opened it exposing the blade. He threatened to use it against Deputies and refused to come down from the roof.

I witnessed Deputy Oman deploy her OC spray. Applegate began yelling, spitting, and threw his vape pen onto the ground in the direction of Deputies. I asked for permission to spray the house in the area the shade was to prevent Applegate from using the area. It was agreed I would approach from the north side of the garage roof and deploy OC. I could not see Applegate and discharged an entire canister of OC spray in the shaded area on the north west corner. The results were not what I was aiming for and decided I would need to get another canister to effectively spray the side of the residence where the majority of the shade was. Applegate said something, that I cannot remember at this time, causing me to believe some of the OC may have sprayed near him or on him. He did not seem affected by it though.

I then received another canister from Deputy Volker. I started effectively spraying the siding of the residence and was not able to see Applegate on top of the roof. Applegate abruptly moved his face directly into the stream of OC spray. I felt as though he was going to spit on me or throw some sort of object at me. When his face appeared in the area I was spraying OC, it startled me causing me to jerk before running out of view to avoid getting items thrown at me or spit on. OC hit him in the face due to him exposing it directly into the stream. It had effect on Applegate and he complained about it not feeling good. Applegate also had snot running from his nose and his face appeared to be more red than normal. I did not intentionally spray Applegate with OC.

Applegate eventually walked to the awning on the east (backyard) side of the property. A group of Deputies went to the second story window outside of the awning and spoke to Applegate. We showed him a printed copy of a warrant for his arrest. When Applegate reached in to grab the paper Deputy Johnson, Deputy Shipley, and myself grabbed him pulling him inside the window onto the floor. Prior to this we moved dangerous items out of the way attempting to make it as safe as possible for Applegate and ourselves. He did not resist and was rolled over and placed into handcuffs.

Applegate was walked down the stairs while I kept full control over his arm in case he fell. He was then seen by medical. Refer to Deputy Mackie's report for further information.

WEAPONS-OTHER

# Multnomah County Sheriff's Office
## DISTRICT ATTORNEY RELEASE

CASE NUMBER
GO 40 2023-18576

ASST RENDERED-GOVT AGENCY

### Gresham Police Department
#### OFFICIAL POLICE RELEASE

CASE NUMBER
GO 41 2023-16871

| ACTION TAKEN (NARRATIVE) | |
|---|---|
| **AUTHOR**<br>STILL, NATHAN (57124) | **DATE/TIME**<br>04/27/2023 0650 |
| **SUBJECT**<br>NARRATIVE | |

ACTION TAKEN

On 04/27/2023, at 0650 hours, I was assigned to Gresham Police Department (GPD) uniform patrol operations. I heard, over the radio, that the Multnomah County Sheriff's Office (MCSO) respond to ▮▮▮▮▮▮ on the report the victim has a Restraining Order (RO) against her son, later identified as Daniel Applegate. Additionally, I heard the following:

-Applegate is the respondent to RO 22PO13043

-Flagged Resist and Hostile to Law Enforcement

-Usually Runs

-High on suspected Methamphetamine

I arrived on the scene and offered my assistance to MCSO Sgt. Hughes. I took the role of a less-than-lethal operator (40mm impact munition) and the element lead for the rear containment unit. I noticed Applegate was on the roof of the second-story house. I noted he was extremely animated and defiant toward law enforcement. I was brief on the Probable Cause to arrest Applegate; it was later learned there was a statewide felony for his arrest. Also, while on the scene Applegate pulled out a folding pocketknife (from distance I would say 4-6 inches in blade length) and actively threaten to harm/kill officers on the scene multiple times. Applegate additionally, was continuing to smoke a substance out of a clear crystal pipe which I suspected was more methamphetamine.

During a prolonged stand-off period, multiple attempts were made to communicate with Applegate. He would be argumentative and aggressive towards any line of communication. Nothing we, law enforcement, were saying to Applegate was working. It should be noted that the weather outside was a nice day, and the sun was coming up. I knew that the temperature outside would rise making it uncomfortable for Applegate to remain on the roof. Several plans were hatched to allow time and discomfort to speed the progression along Applegate moving off the roof.

After most of the roof was covered in sunlight a small portion of the front of the roof was the only spot covered in shade. Applegate began to stare at this area and a plan was formed to use OC and spray on the walls of the shaded area as an area denial for him. Applegate had been given multiple opportunities to leave the roof and been provided with means for him to safely do this via ladders. The ladders agitated Applegate and he tried to pull them up to him. Eventually, Applegate moved to this shaded area and OC was applied. I noted the effects on myself quickly and I was on the backside of the property. (Refer to MCSO use of force report for deployment).

This application after the effect began to take place on Applegate allowed some lines of

\* WEAPONS-OTHER

# Multnomah County Sheriff's Office
## DISTRICT ATTORNEY RELEASE

CASE NUMBER
GO 40 2023-18576

ASST RENDERED-GOV'T AGENCY

## Gresham Police Department
### OFFICIAL POLICE RELEASE

CASE NUMBER
GO 41 2023-16871

communication. Applegate began to become focused on me as I was the non-MSCO deputy on the scene. I explained that I was with the Gresham Police Department, and I was there to assist him, but he needed to come off the roof and not be armed. After several rounds of talking with Applegate. I explained I would exchange him some water if he were to throw the knife off the roof into an area where law enforcement was not located.

Applegate complied and discarded the knife, and I provided water to him. This was a gesture of good faith and I wanted to continue to build upon this. Applegate was angry about why we were there, and I explained the probable cause to arrest him and the warrant for his arrest. During this time Applegate had moved to a lower portion of the house on an awning with window access. Deputies moved to this area for a fleeting opportunity to take Applegate into custody should he move into a window.

Applegate wanted to see a copy of the warrant and I requested a copy of the be bought. While waiting for this, Applegate noticed the deputies in the windows, and they opened them. Applegate moved up and conversed but would turn his attention back to me and move away from the windows. It became a back-and-forth between the windows and me. I then chose to move into the house and the window he was focused on. After some more talking with him, an opportunity presented itself and Applegate was pulled through the window. I immediately grabbed and controlled his head to keep his airways open. I then assisted in controlling and arm so he could be placed in handcuffs. I then left the location and returned to the city. I briefed GPD Sgt. Herrera on my involvement and that I would be writing a supplemental report. I cleared the call.

ACTION RECOMMENDED

Forward to MCSO Case 23-18576



