IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

**DANIEL APPLEGATE**,

    Plaintiff,

v.

**TRAVIS RITCHIE and KERRI OMAN**,

    Defendants.

Case No. 3:23-cv-1168-SI

**ORDER**

**Michael H. Simon, District Judge.**

Daniel Applegate ("Plaintiff") sues Multnomah County Sheriff's Office ("MCSO") patrol officers Travis Ritchie and Kerri Oman ("Defendants"). Plaintiff brings these claims against Defendants under 42 U.S.C. § 1983, alleging that their conduct in connection with his arrest on April 27, 2023, violated the Eighth Amendment. Plaintiff seeks $15,000 in damages as well as declaratory relief. Defendants move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. ECF 19. For the reasons discussed below, the Court grants Defendants' motion for summary judgment.

**STANDARDS**

A party is entitled to summary judgment if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine

PAGE 1 – ORDER

dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To meet its burden, "the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000); *see also Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) ("When the nonmoving party has the burden of proof at trial, the moving party need only point out 'that there is an absence of evidence to support the nonmoving party's case.'" (quoting *Celotex*, 477 U.S. at 325)). "Where the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). "If the moving party meets its initial burden, the non-moving party must set forth, by affidavit or as otherwise provided in Rule 56, 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)).

Courts must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001). Although "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment," the "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient." *Anderson*, 477 U.S. at 252, 255. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

PAGE 2 – ORDER

A court must liberally construe the filings of a self-represented, or *pro se*, plaintiff and afford the plaintiff the benefit of any reasonable doubt. *Hebbe v. Pliler*, 627 F.3d 338, 342 (9th Cir. 2010). The Ninth Circuit further instructs that "an ordinary *pro se* litigant, like other litigants, must comply strictly with the summary judgment rules. *Pro se* inmates are, however, expressly exempted from this rule." *Thomas v. Ponder*, 611 F.3d 1144, 1150 (9th Cir. 2010) (citation omitted). For a *pro se* inmate, courts "should avoid applying summary judgment rules strictly." *Id.* "This rule exempts *pro se* inmates from *strict* compliance with the summary judgment rules, but it does not exempt them from *all* compliance." *Soto v. Sweetman*, 882 F.3d 865, 872 (9th Cir. 2018) (emphasis in original). The exception for *pro se* inmates does "not entirely release [an inmate] from any obligation to identify or submit some competent evidence supporting his claim." *Id.*

## BACKGROUND

Plaintiff was arrested on April 27, 2023. Compl. (ECF 1) at 3; ECF 9 ¶¶ 3-4. At least eight MCSO officers, including Defendants, and one Gresham Police officer responded to a 911 call and were dispatched to the home of Plaintiff's mother. ECF 9 ¶ 4; ECF 27 at 8-45. When the MCSO officers arrived, they found Plaintiff in his mother's backyard. ECF 27 at 10. Plaintiff's mother had a restraining order that prevented Plaintiff from contacting her or being at her home. *Id.* After Plaintiff spotted the officers, he attempted to flee. *Id.* The officers told Plaintiff he was under arrest and warned him they would use force if necessary. *Id.* at 27. Plaintiff climbed onto the roof of the house to avoid capture. *Id.* at 10. Defendants were unable immediately to arrest Plaintiff because he was located on the angled roof and would not come down using a ladder the officers provided. *Id.* at 10, 21. Plaintiff remained on the roof for more than six hours, from approximately 6:20 a.m. to 12:48 p.m. *Id.* at 10-11, 27. As the incident progressed, the officers learned that Plaintiff also had a felony warrant for his arrest. *Id.* at 10, 27.

PAGE 3 – ORDER

The officers and Plaintiff's mother believed that Plaintiff was high on methamphetamine at the time. *Id.* at 14, 29, 42. While on the roof, Plaintiff was muttering to himself, flexing his hands in awkward positions, and fidgeting sporadically. *Id.* at 14. The officers also observed him smoking out of an "elongated glass tube, commonly used to smoke methamphetamine." *Id.* The officers engaged in various efforts to persuade Plaintiff to come down from the roof to no avail. They gave "verbal commands and instructions" to Plaintiff, offered him food, water, and cigarettes, and used a drone as a long-range acoustic device to make loud noises that would "annoy" him. *Id.* at 10-11, 20, 27, 30. Plaintiff eventually exhibited signs of frustration and called 911 while still on the roof. *Id.* at 11. The dispatcher transferred the call to Oman, who was on site and is a member of MCSO's crisis negotiation team. *Id.* at 11. Oman spoke with Plaintiff on the phone for 40 minutes attempting to de-escalate the situation and persuade Plaintiff to leave the roof. *Id.* at 11, 17. Plaintiff, however, "was adamant about not coming down from the roof." *Id.* at 17.

After Oman's unsuccessful attempt to persuade Plaintiff to leave the roof, Plaintiff began moving around. Oman and Ritchie sprayed three large canisters of pepper spray on the roof and siding of the house in an attempt to limit the areas to which Plaintiff could move. *Id.* at 11, 17, 34; ECF 9 ¶ 5. Some of the pepper spray hit Plaintiff in the face. ECF 27 at 17, 34. Plaintiff alleges that Oman "intentionally and unprovoked maced [him] in the face, eyes, and mouth," and sprayed "a full can" of pepper spray at him. Compl. at 3. Plaintiff also alleges that Ritchie sprayed him with pepper spray for a second time. *Id.* Ritchie asserts that Plaintiff "abruptly moved his face directly into the stream of [pepper] spray," and he "did not intentionally spray" Plaintiff. ECF 27 at 34. Plaintiff became lethargic as time passed and "began discharging mucus from his nose and mouth." *Id.* at 11.

PAGE 4 – ORDER

About one hour after Plaintiff was hit with pepper spray, MCSO officers opened a window on the second floor and spoke with Plaintiff. *Id.* When Plaintiff came near the window, the officers grabbed him and pulled him into the house. *Id.* After Plaintiff was inside, MCSO officers arrested and handcuffed him. *Id.* The officers put Plaintiff in a police car and gave him water. *Id.* They asked Plaintiff if he needed medical care, which Plaintiff declined, saying he was not injured. *Id.* Nevertheless, the officers called paramedics to wash the pepper spray off Plaintiff's face and evaluate him. *Id.* at 11-12. After Plaintiff was cleared by medical staff, he was transferred to the Multnomah County Detention Center and booked into jail. *Id.* at 12.

## DISCUSSION

Plaintiff alleges a claim of excessive force, in violation of the Eighth Amendment. The Eighth Amendment, however, protects only convicted individuals. *See Ingraham v. Wright*, 430 U.S. 651, 671 n.40 (1977) ("Eighth Amendment scrutiny is appropriate only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions."); *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983) (applying *Ingraham* to hold that "[b]ecause there had been no formal adjudication of guilt against" a person at the time that he was injured by the police, "the Eighth Amendment has no application"); *Johnson v. City of Dallas*, 61 F.3d 442, 444-45 (5th Cir. 1995) (applying *Ingraham* to hold that plaintiff who had not been convicted of violating a public ordinance could not challenge that ordinance under the Eighth Amendment). Because Plaintiff had not been convicted at the time that pepper spray was deployed—nor was he even in the officers' custody—his claim cannot move forward under the Eighth Amendment.

When an "excessive force claim arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment." *Graham v. Connor*, 490 U.S. 386, 394 (1989). Acknowledging that Plaintiff is

PAGE 5 – ORDER

unrepresented, the Court will construe Plaintiff's claim as alleging a violation of the Fourth Amendment and evaluate it as such.

Defendants make two arguments in support of summary judgment. First, no reasonable juror could find that Defendants used excessive force on Plaintiff. Second, even if there is a dispute of fact on whether the force used was reasonable, Defendants are entitled to qualified immunity.

### A. Excessive Force Under the Fourth Amendment

"Under the Fourth Amendment, police may use only such force as is objectively reasonable under the circumstances." *LaLonde v. County of Riverside*, 204 F.3d 947, 959 (9th Cir. 2000). To determine whether the force used to make an arrest was reasonable, courts balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (quotation marks omitted). Thus, the Court first "assess[es] the gravity of the particular intrusion on Fourth Amendment interests," then "assess[es] the importance of the government interests at stake," and finally, "balances[s] the gravity of the intrusion on the individual against the government's need for that intrusion to determine whether it was constitutionally reasonable." *Young v. County of Los Angeles*, 655 F.3d 1156, 1161 (9th Cir. 2011) (quotation marks omitted). "Although on summary judgment we view the evidence in the light most favorable to [the nonmovant], 'the reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Luchtel v. Hagemann*, 623 F.3d 975, 980 (9th Cir. 2010) (quoting *Graham*, 490 U.S. at 396) (cleaned up).

#### 1. Gravity of the Intrusion

The first step of the *Graham* analysis assesses the gravity of the intrusion on Fourth Amendment interests. *Graham*, 490 U.S. at 396. Defendants used pepper spray to contain

PAGE 6 – ORDER

Plaintiff's movement on the roof, and some of the pepper spray hit Plaintiff's face. Pepper spray is a "form[] of force capable of inflicting significant pain and causing serious injury." *Young*, 655 F.3d at 1161. Therefore, pepper spray is "regarded as 'intermediate force' that, while less severe than deadly force, nonetheless present[s] a significant intrusion upon an individual's liberty interests." *Id.* at 1161. "Less than deadly force that may lead to serious injury may be used only when a strong governmental interest warrants its use[.]" *Deorle v. Rutherford*, 272 F.3d 1272, 1285 (9th Cir. 2001). The Court views the evidence in the light most favorable to Plaintiff. Thus, Defendants' conduct—spraying Plaintiff in the face with pepper spray—resulted in a serious intrusion on Plaintiff's Fourth Amendment interests, and the Court must determine if the governmental interests were sufficient to justify this use of force.

### 2. Government's Interest

Moving to the second step of the *Graham* analysis, the Court evaluates the government's interest by assessing the "core factors": (a) the severity of the crime; (b) whether the suspect posed an immediate threat to the officers' or public's safety; and (c) whether the suspect was "actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. These factors are not exclusive, and the Court looks to the totality of the circumstances. *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010); *Luchtel*, 623 F.3d at 980 (explaining that courts must consider, "under the totality of the circumstances, the 'quantum of force' used to arrest the plaintiff, the availability of alternative methods of capturing or detaining the suspect, and the plaintiff's mental and emotional state") (citations omitted). The Ninth Circuit has stated, however, that "the most important single element of the three [*Graham*] factors" is whether the suspect posed an immediate threat to the safety of the officer or others. *Chew v. Gates*, 27 F.3d 1432, 1441 (9th Cir. 1994). The primary government interests at stake in Plaintiff's encounter with the MCSO officers, including Defendants, were protecting Plaintiff's mother,

PAGE 7 – ORDER

keeping both Plaintiff and the MCSO officers safe, and arresting Plaintiff, who was "barricaded" on his mother's roof.

First, the Court considers the severity of Plaintiff's crime. Plaintiff's initial crime was violating a restraining order by coming to his mother's house. ECF 27 at 8; *see also* Or. Rev. Stat. § 163.750 ("Violating a court's stalking protective order is a Class A misdemeanor, [but] . . . violating a court's stalking protective order is a Class C felony if: [t]he person has a prior conviction for: [s]talking, or . . . [v]iolating a court's stalking protective order . . . .").[1] At the time Defendants deployed the pepper spray, the officers had determined there was also a felony arrest warrant out for Plaintiff for aggravated harassment. ECF 27 at 8, 10. "The government has an undeniable legitimate interest in apprehending criminal suspects . . . . [T]hat interest is even stronger when the criminal is . . . suspected of a felony." *Miller v. Clark County*, 340 F.3d 959, 964 (9th Cir. 2003). Plaintiff also had resisted arrest by unlawfully using a weapon, refusing to comply with police officer instructions, and threatening police officers. *See* Or. Rev. Stat. § 162.315 ("A person commits the crime of resisting arrest if the person intentionally resists a person known by the person to be a peace officer or a parole and probation officer in making an arrest."). Cumulatively, Plaintiff was engaging in and wanted for severe crimes, and the government had a significant interest in apprehending Plaintiff. This factor favors the Defendants.

---

[1] It is not clear whether Plaintiff had previously violated a stalking order such that his actions on April 27th would be classified as a felony. The Court, however, views the evidence in the light most favorable to the Plaintiff and assumes Plaintiff initially only committed a misdemeanor, which alone would not justify the use of intermediate force. *See Bryan*, 630 F.3d at 828-29. There were, of course, other factors at play in the use of force against Plaintiff besides his initial criminal conduct.

Second, the Court evaluates the "most important" factor; whether Plaintiff posed an immediate threat to the safety of the officers or others. Although the Court views the evidence in the light most favorable to Plaintiff; the reasonableness of the use of force is judged from the perspective of a reasonable officer. *See Luchtel*, 623 F.3d at 980. From the perspective of Defendants, Plaintiff was an immediate threat. Plaintiff brandished a knife with a four to six inch blade and threatened to kill the officers and their families. ECF 27 at 10, 14, 17, 20, 30, 34, 42. It was only after the pepper spray was deployed that an officer successfully persuaded Plaintiff to surrender the knife in exchange for water. *Id.* at 21. Plaintiff threw a vape pipe at Oman, tried to spit on her, and threatened to kill her. *Id.* at 17, 34. Additionally, as Ritchie was attempting to deploy his can of pepper spray to the roof and side of the house and sprayed Plaintiff in the face, Ritchie "felt as though [Plaintiff] was going to spit on [him] or throw some sort of object at [him]." *Id.* at 34. The MCSO officers believed plaintiff was a danger to himself, and they feared he might fall and "injure himself due to [his] state of mind, physical fatigue from the heat of the day and standing on the roof." *Id.* at 27. Oman and Ritchie deployed the pepper spray to restrict Plaintiff from accessing portions of the roof to make it easier to arrest him. *Id.* at 17, 34.

A reasonable officer confronting a suspect who defied police orders, was likely high on methamphetamine, brandished a knife, and threw objects at and verbally threatened officers, all while perched on a roof to avoid arrest, would believe that individual posed an immediate threat to his or her safety and to the safety of other officers. *See Miller*, 340 F.3d at 964-65 (holding that a deputy was entitled to assume that an individual who had attempted to flee from the police by recklessly driving a car, possessed a large knife, likely had mental health problems, and was fleeing officers over unknown terrain, posed an immediate threat to safety). This factor favors Defendants.

Finally, the Court evaluates whether Plaintiff "was actively resisting arrest or attempting to evade arrest by flight." *Id.* at 965. At the time Defendants initially deployed the pepper spray, Plaintiff had been evading arrest for hours. *See* ECF 27 at 10-11, 14-15, 17, 20, 27. By remaining on the roof and refusing to use the ladder the police officers provided to come down, Plaintiff effectively created an "open-air barricaded situation." *Id.* at 21. The MCSO officers were unable to persuade Plaintiff to leave his position on the roof, and they were not able to arrest him due to "his elevated position and the exceptionally dangerous possibility of taking a resistive suspect into custody on an angled rooftop." *Id.* This factor weighs heavily in the Defendants' favor.

An additional factor the Court may consider in the *Graham* analysis is whether there were alternative methods for de-escalating the situation or capturing a suspect. *Smith v. City of Hemet*, 394 F.3d 689, 703 (9th Cir. 2005); *Hyer v. City & County of Honolulu*, 118 F.4th 1044, 1063-64 (9th Cir. 2024). It is relevant that the MCSO officers attempted unsuccessfully to use less forceful means to arrest Plaintiff. *See Miller*, 340 F.3d at 966 ("Although the government need not show in every case that it attempted less forceful means of apprehension before applying the force that is challenged, we think it highly relevant here that the deputies had attempted several less forceful means to arrest Miller, including: signaling to Miller with emergency lights and siren to stop his vehicle; pursuing Miller's vehicle in a police cruiser; pursuing Miller on foot; and audibly warning Miller to surrender or be chased by a police dog. Because of Miller's defiance, each of these less drastic measures failed.").

The MCSO officers, including Defendants, used numerous less invasive tactics to persuade Plaintiff to leave the roof before resorting to pepper spray. First the officers brought a ladder to the roof, ECF 27 at 10-11, 20, and offered Plaintiff food, water, and cigarettes to come down, *id.* at 27. The officers, especially Oman, communicated with Plaintiff orally by giving

direct commands and attempting to de-escalate by phone. *Id.* at 11, 17, 20, 27, 30. Next, the officers used a drone to annoy Plaintiff to try and make him come down. *Id.* at 11, 15, 20, 30. Finally, the officers decided to spray pepper spray to the side of the house to limit the areas Plaintiff could access and "shrink the problem." While Defendants applied the pepper spray in that manner, Plaintiff was hit in the face. Ritchie characterizes this as an accidental contact with Plaintiff and states that Plaintiff "abruptly moved his face directly into the stream of [pepper] spray." *Id.* at 34. Even if the pepper spray was directly and intentionally applied to Plaintiff's face, as Plaintiff alleges in his Complaint, this use of intermediate force occurred after numerous attempts to arrest Plaintiff using less forceful means.

### 3. Balancing Intrusion Against Interests

Balancing the significant intrusion of Plaintiff's Fourth Amendment interests against the government's need for that intrusion weighs heavily in favor of Defendants. All the *Graham* factors weigh in favor of the Defendants and support a strong governmental interest. The crimes involved were serious, Defendants reasonably believed Plaintiff was an immediate threat to his own and their safety, and Plaintiff was actively evading arrest. Additionally, the officers engaged in numerous less forceful methods to de-escalate and arrest Plaintiff before using pepper spray. The evidence, viewed in the light most favorable to the Plaintiff, shows the governmental interest was substantial, and even a significant intrusion on Plaintiff's interests was justified. The *Graham* analysis supports the conclusion that the use of force was reasonable. Therefore, Defendants' use of force was not excessive in violation of the Fourth Amendment. Summary judgment in favor of Defendants is appropriate.

## B. Defendants' Qualified Immunity Defense

Additionally, Defendants are entitled to qualified immunity. "The doctrine of qualified immunity protects government officials from liability for civil damages. . . ." *Wood v. Moss*, 572

PAGE 11 – ORDER

U.S. 744, 757 (2014); *see also Krainski v. Nevada ex rel. Bd. of Regents*, 616 F.3d 963, 968 (9th Cir. 2010). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). "Whether qualified immunity can be invoked turns on the objective legal reasonableness of the official's acts. And reasonableness of official action, in turn, must be assessed in light of the legal rules that were clearly established at the time the action was taken.'" *Ziglar v. Abbasi*, 582 U.S. 120, 151 (2017) (cleaned up).

In *Saucier v. Katz*, 533 U.S. 194, 200 (2001), the Supreme Court outlined a two-step process for determining the applicability of the qualified immunity doctrine. The first step is to determine "whether a constitutional right would have been violated on the facts alleged." *Id*. The second step is to determine "whether the right was clearly established." *Id*. Because the Defendants' use of force was reasonable under the *Graham* analysis, there was no Fourth Amendment violation. Thus, Defendants are entitled to qualified immunity and the Court does not proceed to the second step of the inquiry.

## CONCLUSION

The Court GRANTS Defendants' motion for summary judgment, ECF 19.

**IT IS SO ORDERED**.

DATED this 12th day of November, 2024.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge